## WEIR *vs.* FITZGERALD.

*In the matter of proving the last Will and Testament of* JOHN BRINCKLEY, *deceased.*

A WILL contested on the ground of incapacity, undue influence, and invalid execution—admitted to probate. Where the testator was of advanced age, his hearing slightly affected, and his sight very seriously impaired, the circumstances attending the execution of his will should be carefully scrutinized for any traces of imposition or artifice. Kind offices and faithful services tend to influence the mind in favor of the party performing them; and care should be taken not to confound the natural action of the human feelings in this respect, with positive dictation and control exercised over the mind of the testator.

The law does not prohibit deaf, dumb, or blind persons from making a will. Defects of the senses do not incapacitate, if the testator possess sufficient mind to perform a valid testamentary act.

The statute does not require a will to be read to the testator in presence of the witnesses, though it is proper to do so when the testator is blind or cannot read.

Besides mere formal proof of execution, something more is necessary to establish the validity of a will when, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the formal execution. Additional evidence is required that his mind accompanied the will, and that he was cognizant of its provisions. This may be established by the subscribing witnesses, or by evidence *aliunde.*

It is not essential that both witnesses should prove that the provisions of the statute, as to the mode of execution, were complied with. Where one witness testified clearly to their performance, and the recollection of the other was vague and indistinct—held, that the proof of execution was sufficient.

L. R. MARSH, *for Executor.*

I. The requisites of the statute have been complied with in the execution of this will.

1. It was subscribed by the testator at the end of the will.

2. It was subscribed by him in the presence of each of the attesting witnesses, *and* acknowledged to have been so made to each of them.

3. It was at the same time declared by him to be his last will and testament, and

4. There were two attesting witnesses, each of whom signed as such at the request of the testator.

These requisites are evidenced by the attestation clause, as well as by the testimony of the two subscribing witnesses.

II. If it be said that the testator was afflicted with loss of sight, and therefore, greater care was necessary than in other cases. We reply:

1. The statute makes no distinction between a blind man and one who can see. These requisites apply to all— blindness or deafness does not incapacitate. If these requisites of the statute have been substantially complied with, the will is valid, unless otherwise impeached, whether the testator was blind or deaf.

2. The old man could see to some extent. At times better than at others. He could walk the streets unattended; see when he approached the gutter; discern forms; could write his name, and write it well—witness the receipts sworn to by I. W. Gross, and his signature, in 1845, to the bond and affidavit. By his glass he could detect the joints between bricks. He was not so far deficient in vision as to disable him from knowing what was taking place around, at the time of the execution of the will. Nor was any trick or fraud played off upon his sense of sight at that time.

3. Unusual care was adopted by the attorney. Mr. Hopper, who drew this will and officiated at its execution,

testified that he drew the will according to *testator's directions*, from a former will ; that he read it over several times to the testator, explaining it to him ; that at the time of execution, he asked him if he declared this which he had just signed, to be his last will and testament, and he said "I do." "Do you desire Mr. Albro, the gentleman present, and myself, to witness your signing and declaration ?" and he said, "I do." Then Mr. Hopper told him that a little ceremony was required, and that he should read the attestation clause of the will, which they (the witnesses) were required to sign and certify, and thereupon did read it, and then told him that Mr. Albro and himself would sign it if he desired it, and he said he did ; and the witnesses thereupon signed it.

There was in the execution of this will, a deliberation, a formality, and a full and ceremonious compliance with all the forms of the statute, to an unusual degree and extent, for the very reason, that the testator had not the full benefit of his sight.

4. The decedent was in full possession of his faculties of hearing, and therefore, could well know, unless the will was *fraudulently* read to him, what he was doing.

The evidence on the subject of his hearing, is full and conclusive.

That he was *a little hard of hearing* is obvious ; but that this amounted to any incapacity to do business or make a will, cannot be plausibly contended.

Some of the witnesses observed that he was a little hard of hearing, and others who were on terms of intimacy and daily intercourse with him (Peixotto, contestant's witness, and others), *never noticed any defect* in his hearing at all.

III. It was said on the motion in the nature of a motion for a nonsuit, that the *subscription* must be made in the presence of two witnesses, and at the testator's request. We reply :

1. This is *not* necessary. The statute does not require

it. It may be either so subscribed *or acknowledged*—§ 32, *subd.* 2.

2. It was, in fact, subscribed in the presence of the two witnesses, who witnessed at request of testator.

*Hopper* swears that this was so, and gives his account with great minuteness.

*Albro* swears that his impression is that he saw the testator sign the will, and he should have thought it singular if he did not.

3. It is not necessary that both witnesses should *remember* all the requisites, especially when one of them does distinctly remember them.

If the witnesses are dead or absent, it is enough to prove their signature. The will in such case is admitted to probate without any proof of the recollection of the witnesses.

So, *it is held*, that when it is stated in the attestation clause, that the requirements of the statute have been complied with, specifying them, *the mere want of recollection of the witnesses*, is not evidence of non-compliance. It will be presumed that the witnesses would not have signed a false statement; and the will must be regarded as duly proved, unless *affirmative proof* of non-compliance is introduced. (26 *Wendell*, 325, *Remsen* vs. *Brinckerhoff*.) No such affirmative proof is offered in this case.

IV. It was stated on said motion as for nonsuit, that the will must be *declared* by the testator to be his last will and testament, in the presence of the two witnesses. We answer:

1. It was so declared.

Mr. Hopper swears to it most unequivocally.

The attestation clause states it so, and it is not necessary, therefore, that Albro should remember it. It will be so held, under the authority last cited, unless *affirmative proof* to the contrary is given.

But Mr. Albro says that Hopper asked testator if he

declared this to be his last will and testament, and the testator assented, nodding his head.

This, of itself, was a sufficient declaration.

Such *declaration* need not be in any form of words. "To declare to a witness that the instrument subscribed was the testator's will, must mean, to make it at the time distinctly known to him by some assertion, or by clear assent in words *or signs*." (26 *Wendell*, 336, *Remsen* vs. *Brinckerhoff*.)

V. The idea that the testator could not make a valid will from defect of mind or memory, seems wholly lost under the overwhelming evidence from the witnesses on both sides on the subject.

The pretence of the contestants was not, that there was any tendency to *insanity*. It has not been intimated that it would be contended that there was any mental aberration.

The idea put forth by contestants' counsel seems to be, that advancing years and affliction in his sight, had weakened the vigor of the testator's mind and impaired his memory. As to this, we reply :

1. That the evidence is conclusive, that Mr. Brinckley's mind *was firm and sound, and his memory good*.

Even on the contestants' own evidence, this is clear.

*McCord* says he talked understandingly, not incoherently, but like a man of sound mind.

*Peixotto* says his memory was fair, and his mind was firm.

*Rynex* thinks his mind was weakened by his having *sore eyes!*

So far from any affliction in the eyes having a tendency to impair the mind or memory, the effect of it is directly the reverse. A man unable to use his eyes is more in the habit of trusting to his memory, which improves under the additional confidence thus reposed in it. Instances of this, I doubt not, will occur to every man within the circle of his own acquaintance.

*Christopher*—Never noticed any defect in his mind or memory ; talked reasonably two or three days before his death.

*Miss Gross* says his mind was *sound*.

*Edward Gross*—Never observed any signs in him of age, decay, or impaired intellect.

This is the evidence with which the contestants come into the field.

We call *Dr. Ogden*. He saw no indications of derangement or imbecility, or debilitated mind.

*Wheeler* never observed any signs of giving way in his mind—perfectly rational, and so up to the time of the accident.

*Betts* worked for him and talked with him, and saw nothing to excite suspicion.

*Martin*—His mind was *firm and strong*—sound intellect—and intelligent.

*Harding*—His mind very sound and very acute, never perceived any weakness or loss of memory.

*Haviland*—Mind good as usual for that time of life.

*Margaret Gamble*—The testator used to visit her in her blindness, and afford his assistance ; and, as she could not read, would repeat to her whole chapters in different parts of the Bible.

Can the learned counsel for the contestants furnish the same evidence of their capacity to make a will, in benevolence of mind and tenacity of memory, as the testimony of Margaret Gamble shows to have been possessed by Mr. Brinckley ?

And all agree that his *health was good*, his habits regular, and his exercise systematic. Such a man is not likely, at the age of 76, to have his intellect flicker dimly in its socket.

It appears he had mind enough to *gather* a handsome estate, and, what requires equal prudence and care, to *keep it, too*.

2. But it is not indispensable to the capacity to make a

valid will, that the mind should retain its original strength, or be a mind of strength.

The testator may not be capable of managing his own business—he may tread on the confines of idiocy itself—yet, if he be *not an idiot*, his right to make a will is not impaired.

"Imbecility of mind in a testator, will not avoid his last will and testament. Idiots, lunatics, and persons *non compos mentis*, are disabled from disposing of their own property by will; but every person not embraced within either of the above classes, of lawful age, and not under coverture, is competent to make a will, *be his understanding ever so weak*. Courts, in passing upon the validity of a will, do not measure the extent of the understanding of the testator, *if he be not totally deprived of reason;* whether he be wise or unwise, he is the lawful disposer of his property, and his will stands as a reason for his actions."

" A man's capacity may be perfect to dispose of property *by will*, yet inadequate for the management of other business ; as, for instance, to make contracts for the purchase and sale of property ; and therefore a court of chancery may commit the property of a person *incapable of managing his estate* to the charge of a committee, and yet, after his death give effect to a will made by him whilst laboring under such incapacity." (26 *Wendell*, 255, *Stewart's Ex'rs.* vs. *Lispenard;* confirmed in 3 *Denio*, 37, *Blanchard* vs. *Nestle*.)

VI. The great cause of objection seems to be, that the testator has seen fit to give a large share of his property to his nephew, Dr. James Weir.

Well, this he had a right to do. (9 *Cow.*, 208, *Jackson* vs. *Betts;* 2 *Hill*, 570, *Germond* vs. *Jones*.)

But if it is contended that *undue influence* was used to induce this bequest. We reply :

1. The case lacks *all evidence whatever* of any *undue*

*influence.* On the contrary, the contestants prove, by Peixotto, that he knew of *no* fact indicating that Weir had any control over the testator's mind.

This is a somewhat conclusive answer to the objection.

2. The testator was not a man likely to be *unduly influenced.*

That his mind was good and firm, is abundantly established; and the contestants themselves prove, by Peixotto, that it was *independent.*

3. There is no evidence whatever that Weir ever requested the testator to remember him in his bequests, or made any suggestion as to any of the provisions of his will. On the contrary, it appears by the testimony of Wm. Hopper that the testator *himself*, *alone*, directed how it should be drawn.

4. But if he had solicited such testamentary remembrance, and urged it by fair persuasion, it would not invalidate the will.

One has a right, by fair argument or persuasion, to induce another to make a will in his favor. (3 *Denio, R.*, 37, *Blanchard* vs. *Nestle ; 3 Serg. & Rawle*, 269, *Miller* vs. *Miller.*)

5. But in this case there was every good reason why the testator should devise a liberal share of his fortune to Mr. Weir.

Mr. Brinckley had neither wife nor child. In giving his property to his nephew, he disregarded no one who had any claims upon him. He violated no promptings of natural affection or claims of blood. Mr. Weir had been kind and attentive to him for many years. He made Weir's store his place of habitual resort. It gave him pleasure to visit Weir and his family. He always found there friends and a home. He had taken an interest in his nephew's education and advancement. He bestowed on Weir the affection he would have given to his own child. When Weir was sick, the old man was anxious and alarmed. Weir returned his good offices and kindness, was always ready

4

to aid him, and for years assisted him in the management
of his affairs.

If these contestants ever helped the old man over a
gutter, or lifted a finger to aid him, or spoke a kind word
to console him—or did any act whatever to smooth his de-
scending journey, the evidence of it exists elsewhere than
in this case.

That Mr. Brinckley should have felt attached to Weir,
and been moved by gratitude for his long and continuous
kindness, care and assistance, was not only natural, but
one of the strongest evidences of a sound and healthy mind.

These very qualities, attachment and gratitude to a
donee for long and persevering care and kindness, are re-
cognized, in the great case of *Stewart* vs. *Lispenard*, as one
of the evidences of capacity to make a will. (26 *Wend.*,
255, 3*d marginal note.*)

VII. The provisions of the will itself, furnish evidence
on all the foregoing points upon the merits. They seem
just and equitable, neglecting no one, taking care of all;
and yet, with a just discrimination, not unmindful of the
obligations of gratitude, or the promptings of affection.

E. W. MARSH, *for C. M. Sneeden.*

I. The *onus probandi* lies in every case upon the party
propounding the will, and he must satisfy the court that
the instrument so propounded is the last will of a capable
testator. (*Barry* vs. *Butlin*, 1 *Curteis, Ec. R.*, 638;
*Chaffee* vs. *The Baptist Missionary Convention*, 10 *Paige*,
86, 90, 91.)

II. The law in this country does not *favor* wills; on the
contrary, the courts are disposed to construe the statute of
wills strictly. The Supreme Court of Pennsylvania says the
statute of wills should be strictly construed, and adds, "It
is infinitely better, especially when, as in this country, the
law makes an equal and just distribution of the estate, that

a person should die intestate, than that we should run the risk of fraud and mistake, which will be the inevitable consequence of a loose construction of the act. (*Beckly Will*, 9 *Barr's Penn., R. p.* 58 ; 1 *Denio*, 33 ; 8 *Paige*, 491 ; 26 *Wend.*, 325.)

III. The position of the principal witness, Hopper, is not such as to demand implicit and unqualified credit.

1. His want of candor. It does not appear until the fag-end of a long cross-examination that he was testifying to the will of a blind man *who told him he could not see to read*, who could not recognize him by sight. Still, he swears, in his direct examination, that Brinckley *saw* them witness the will.

2. His want of recollection. He cannot recollect the contents of the old will, or of the new will, or any of the alterations.

He cannot recollect in what room the will was executed, or who was present, or any of the attendant circumstances. His testimony is professional.

3. He is contradicted by Albro and Peixotto on material points.

Albro contradicts him as to the alleged conversations which are said to have taken place at the time of the execution of the will ; and Peixotto, as to his intimacy with James Weir, and as to his conversation with him, and his delivery of the will to him.

IV. Each witness should at the time of the execution of the will, be able to testify to all the requirements of the statute. (1 *Denio*, 33.)

1. Albro swears positively, that he did not see the testator sign the will, and heard nothing about signing. This is not a case of want of recollection.

2. Mere presence of the witness in the room without knowledge in his part of what is going on, is clearly not sufficient to make a good execution. (*English Law and Equity Rep., vol.* 2, *p.* 594, *Noding* vs. *Alliston*.)

3. Albro swears positively, that the testator never requested him to witness the will. Hopper swears that after consulting with Brinckley, Weir went for the witness Albro. But what was said at the consultation does not appear. Hopper, perhaps, swears to conversations after Albro arrived, from which a request might be inferred. But he is contradicted by Albro, who swears that he did not see the old man's lips move, and did not hear him say a word.

V. A declaration made by a blind man, under such circumstances that he could not by any possibility be cognizant of the truth of what he was saying, is no declaration within the meaning of the statute, and does not satisfy the 3d subdivision of the 40th section of the statute.

1. A declaration of a blind man as to matters of vision, or of a deaf man as to matters of hearing, is no declaration.

2. The testator at the time of making the declaration, must be able to identify the instrument, and must identify it.

It would not be a sufficient declaration if the testator should declare he had executed a will, if the will was absent, and was not in some way identified *by the testator.*

So if the will is present, and the testator is incapable of identifying it, the declaration is good for nothing and a mere idle, unmeaning ceremony.

VI. The testator being blind, the witnesses could not be said to sign in his presence, any more than though they had been in different rooms.

1. To constitute presence, it is necessary not only that the testator be corporeally present, but that he be mentally capable of recognizing and be actually conscious of the act performed before him. If his view of the proceeding is necessarily obstructed, the mere proximity of the places of his signature and their attestation, will not suffice, even though it were in the same apartment. (*Greenleaf, Evidence, Vol.* 2, § 678; *In re Colman,* 3 *Curt.,* 118.)

VII. There can be no intendments in the case of a blind testator.

On proof of the signature of the testator, it will ordinarily be presumed that he knew the contents of the will. But this presumption may be repelled by proof of any circumstance of an opposite nature, such as his ignorance, sickness, state of mind or the like,—the inconsistency of its provisions with his obvious duty or known affections,— or the character or interests of the persons who wrote the instrument. (*Greenleaf, Evidence, Vol.* 2, § 678 ; *Ingram* vs. *Wyatt*, 1 *Hagg, Ec. R.* 384 ; *Park* vs. *Olatt*, 2 *Phillim, Ec. R., p.* 324 ; *Darling* vs. *Loveland*, 2 *Curt.,* 226.

VIII. The will was executed under circumstances calculated to throw strong suspicion upon it. The testator 74 years old, blind, the will executed away from home in a drug store, his confidential agent and residuary legatee the principal actor, his attorney the principal witness, no change in the circumstances of the testator's family to require a change in the will, the evident secrecy with which every thing was done, the large share of the property willed to the agent, his evident influence by reason of his confidential relations, every thing being prepared when the lawyer came to see him, *and the evident prostration* of the testator at the time of the execution of the will,—all throw a strong suspicion upon the transaction.

Daniel Gardner, *for D. A. Fitzgerald.*

I. The *onus probandi* of every material fact—double or at least by two witnesses, each swearing independently to the necessary facts—lies with the party offering the will for probate. This James Weir has failed to do. (2 *R. St.,* 1*st ed., p.* 63 ; 2 *ed.; p.* 7 § 40 ; *Cavett's Appeal*, 8 *Watts & Serg.,* 21, 25, 26 ; 8 *Paige*, 491, 7, 8, 9, 501, 2 ; 1 *Curteis, Ec. R.,* 127 ; 26 *Wend.,* 325, 333, 6, 7 ; 1 *Denio,*

*R.*, 33, 4 ; 10 *Paige*, 86, 90, 91 ; 1 *Hoffman, Ch. R.*, 1, 2, 4, 5 ; *Ellis Will*, 2 *Curteis, Ec. R.*, 395.)

The will ought to be refused probate, because not read to the blind old man in the presence of two witnesses. (10 *Paige, Ch. R.*, 90 ; 1 *Curteis, R.*, 137, 125, 128 ; 2 *Haggard's Ec. R.*, 189.)

The civil law required the reading of a will to a man who could not read, in presence of seven witnesses and a notary. (*See Domat, Boston ed. of* 1850, *Vol.* 2, 302, *Art.* 20.)

II. The testator's capacity to make a will is not *prima facie* proved by the two witnesses to the will, and it is upon the whole proof disproved or rendered doubtful; and this is fatal to the will. (1 *Paige, Ch. R.*, 171, 173, 4, 5, 6, 7, 8 ;. 3 *Comstock*, 498, 9, 500. *See Revisers' notes to Revised St., on Wills ; McTaggart* vs. *Thompson*, 14 *Penn. Rep.*, *p.* 154 ; 1 *Beck's Med. Jurisp.*, 718, *tit. Dementia.* 1 *Id.*, *p.* 752, *Id.*, 821.

III. Two witnesses do not prove that they either saw the signing of the will, or that the testator acknowledged the signature to them severally, as his witnesses. This is fatal to the will. Lewis' Will, decided by Surrogate of Kings County, New York. (*Legal Observer, Vol.* 9, *p.* 150, 4, 5.) See also, above authorities.

IV. The testator did not request the two witnesses to sign the will in attestation of his signature and of his publication of the paper as his will. This is fatal to the will. Albro never saw the signature of Mr. Brinckley at the execution. Mr. Brinckley did not see, nor could he see, the witnesses sign the will as witnesses, as he was so blind ; so there was no mental presence to the act. (1 *Barbour, S. C. R.*, 530 ; 1 *Douglas, R.*, 241, 314 ; 4 *Kent's Comm.*, 6th ed.; 515 ; 11 *Iredell's N. Carl. R.*, 637.)

V. The testator did not declare the paper to the two witnesses to be his will, and request them severally to attest it; and this is fatal to the will. (*Ib.*)

VI. The will is manifestly the will of James Weir, effected by Hopper, the witness, and by him, Weir; and this is fatal to the will. (1 *Paige*, 171, 172, 4, 5, 6; *Mynn* vs. *Robinson*, 2 *Haggard's Ecclesiastical Rep.*, *pp.* 185, 6, 188, 9, 190, 1, 9, 202, 204, 205; 2 *Moore, Privy Council R.*, 317, 319, 320, 322, 4; *S. C.*, 1 *Curteis, Ec. R.*, 125, 6, 137.)

VII. Especially, the will is void having been procured by Weir, the general agent of the blind man, and his nephew. (3 *Wend. R.*, 629, 630; 4 *Edward's Ch. R.*, 44; 5 *Paige, Ch.*, 650, 6; 4 *Howard's U. S. R.*, 544, 555, 567; 8 *How. U. S. R.*, 183.)

VIII. In the case of Beckly's Will (9*th Barr's Penn. Rep.* 58), decided in 1848, the year of Brinckley's supposed will, it was decided by the Supreme Court of Pennsylvania, that the statute of *wills should be strictly construed;* and the court add, it "is infinitely better, especially when, as in this country, the law makes an equal and just distribution of the estate, that a person should die intestate than that we should *run the risk of fraud and mistakes*, which will be *the inevitable consequence of a loose construction of the act."* [*See* 5 *Barr's R.*, 33.]

Our Revisers, in their report on the New York Statute of Wills, say their object was "To *prescribe distinctly* the *mode of executing wills*," &c.

IX. The ordinary principles of the civil law are adopted into our law, that two witnesses are necessary in relation to wills. (*Domat's Civil Law, by Strahan, Cushing's ed. of* 1850, *Vol.* 1, *p.* 813, § 13.) See also, the authorities on the first point.

X. When the lawyer is employed to draw the will by the party to be benefited by the will, and is the main witness to prove the will, the court is bound to exercise a vigilant suspicion as to the will and its execution, and must refuse probate unless strict proof is given that the testator was capable of understanding the will, and really understood it, and meant it of his or her own volition. (1 *Curteis, Ec. Rep.*, 125, 8 ; *Same case on appeal*, 2 *Moore, Privy Council Rep.*, 319, 320, 4 ; 2 *Haggard's Ec. Rep.*, 185, 6, 8, 9, 190, 1, 9, 202, 4 ; 1 *Id.*, 60, 68.)

XI. In judging of the sanity and capacity of the testator, the court itself is to judge, from the appearance, words and actions of the testator at the time of executing the will (1 *Beck's Med. Jur.*, *p.* 752, 718, 821), and from facts proved, whether he was of sound and disposing mind and memory, and whether he really understood the will ; the mere opinions of the witnesses not being evidence. (*See cases cited to 2nd point ;* 3 *Wash. Cir. Court Rep.*, 580 ; 4 *Wash. Cir. Court Rep.*, 268 ; *Coxe's U. S. Digest, Title Wills.*)

XII. The will was obtained by Weir and Hopper by fraud and management. (1 *Curteis*, 171 ; 2 *Haggard's R.*, 189.)

XIII. Its signing by John Brinckley is disproved by the weight of evidence, and its legal execution by him is not proved.

Albro contradicts Hopper as to his, Albro's, being present at the signing ; and Gross disproves the handwriting of Mr. Brinckley.

XIV. Probate ought to be denied with costs. (2 *Haggard's Ec. Rep.*, 209.)

The above objections are taken against the probate of the paper propounded by James Weir as John Brinckley's

will, and on behalf of Mrs. Sneeden and Mrs. Fitzgerald, two nieces of said Brinckley.

THE SURROGATE. The decedent at the time of his death was 76 years of age. His wife died in 1847, and he had no kin nearer than nephews and nieces. The will propounded for proof, bears date April 28, 1848, and was prepared in a measure from a previous will, executed some three or four years before. It does not appear what the alterations were, though it is not unlikely that the decease of his wife may have occasioned some change in his testamentary intentions. Both these instruments were drawn under instructions, given by the decedent personally to the counsel who prepared them. The probate is contested on the grounds of incapacity, undue influence, and non-compliance with the statutory ceremonials requisite to the valid execution of a will.

Total incapacity is not alleged, but it is urged that his mind and memory were so impaired as to make him the subject of undue influence. In judging of his mental condition, it is important to bear in remembrance, that his hearing was slightly affected, and his eyesight very seriously impaired. But two witnesses express an unfavorable opinion of his competency. Mr. McCord, who knew him for eight or ten years, and for two years succeeding May 1, 1848, was in the habit of seeing and conversing with him several times a week, from his intercourse with him during the latter period says, " I should think he was not capable of attending to business. I should not think he had sufficient intellect to make a contract." " I should judge his memory was very treacherous. He seldom if ever could recognize my voice, though I was in the habit of going in there so often. I generally had to tell him who I was before we commenced conversation." " I could not say I could consider him capable of making a will. I should say if he had bequeathed his property one day, he

could not say the next day how he had distributed it. He might come near to it—he might recollect perhaps the principal bequests he had made, but not accurately. I think it would require a good deal of teaching and instructing, in order for him to make a proper will. I do not think he would know how to estimate the value of his property. I think his mind in 1848, was as feeble as it ever has been. I think he could understand as to his family, and the relations the different members of it bore to him." The witness also expresses the opinion that the decedent had not sufficient capacity to rent his houses, or know the value of rents and of property; and that this arose not so much from want of information as from want of a retentive memory; that his memory was stronger as to matters of remote than as to those of recent date; and he particularizes an instance in 1848 or 1849, in regard to a lawsuit, when his loss of memory indicated itself in a repetition of inquiries at different times, relative to information previously given which he seemed to have forgotten. On cross-examination, Mr. McCord states that although the decedent was indisposed to start subjects of conversation, he talked " understandingly " and " very well " on " usual topics." He also adds, " His mind was not all gone; he did not talk incoherently; he talked like a man of sound mind; he seemed deficient in memory and recognition; I could not say there was any other trait or faculty of mind in which he seemed deficient. I do not think the defect or loss of memory was total. He could recognize a person after being told who the person was, who was present. He did not, that I am aware of, forget the names of his near relatives; but he would forget the names of distant relatives, and ask the names. On one or two occasions, he would ask the names of his niece's children, Eliza Acker." " He was reputed to be worth about $50,000. I think he would generally have his own way, except that in business matters, he would always refer me, and others so far as I knew,

to Mr. Weir." "I don't know any fact indicating any control of Mr. Weir over the mind of the decedent."

Mr. Rynex, who was acquainted with the decedent ten or twelve years, and visited him occasionally at his house, about the commencement of the year 1848, some two or three times a week, says, "I considered his mind as rather imbecile, indeed, quite so. I judged he had suffered very much with his eyes, and he was very hard of hearing; and I considered his suffering from these difficulties had enfeebled his mind." "I did not think him competent to make a will in 1848." "I talked with decedent quite often on various subjects of conversation. He would reply to me very well. He often asked me to tell him the same thing over again; and I would do so again and again, till I could get him to understand what I said. I suppose he understood, for he gave assent to it. I never talked to him on business, or had business transactions with him. I thought him incompetent to make a will, in consequence of the complaints he made about his extreme suffering, and the difficulty I had to make him understand very simple accounts I gave him of passing events." "I cannot say what the cause was of the difficulty I had to make him understand; I judged it was from his mind being affected by his sufferings."

This is the burden of the evidence tending to impeach the capacity of the deceased; and, under the established rules applicable to the subject, it is obviously insufficient to sustain absolute testamentary incompetency. There was nothing like a total deprivation or loss of reason or memory. Whatever doubts this testimony may have suggested must, however, be removed by the evidence not only of the witnesses produced by the executor, but of many who were examined on the part of the contestants.

Miss Gross, a witness for the contestants, who resided in the upper part of the house where Mr. Brinckley lived since 1820, says upon direct examination, " I think as he grew old, his mind became somewhat enfeebled. I don't know but I noticed a failure in his memory; I don't know

in what particular, but I think in some instances I have noticed it." On cross-examination, she states : " I don't re-collect any instances now of the failure of his memory, but I have at the time noticed some, I suppose in the course of the last three years, or perhaps *later*." "I was in the habit, two or three years ago, of conversing with him ; we would talk about different things ; he would answer and talk as though he understood. I think his mind was pretty good, but I think his mind and his hearing failed with his age ; I cannot say to a greater extent than is usual." " He forgot I paid rent to him, once, about a year ago." " *Three years ago this spring, in* 1848, *I should think his mind was sound, allowing, of course, for his age ; I don't know but what his memory was then pretty good ; I don't know that I had up to that time observed any failure in his mind, very particular.*"

Mr. Gross, a witness for the contestants, who knew the decedent for thirty years, and was intimate with him, says his mind " Was about as that of a man of his age should be with his infirmities. *I cannot say that I ever observed any signs of imbecility or of a decayed or impaired intel-lect.*" " *I can't say that he was a man likely to be influ-enced by those who dealt with him.*"

Mr. Christophe, a witness for the contestants, an old acquaintance, who saw him occasionally in 1848, says, " *I can't say I ever noticed any defect in his memory.* Some-times he could recognize me by my voice, at others he would not ; I observed he was a little hard of hearing ; I frequently had to repeat a thing over to him several times ; I should think he was capable of making a will ; he had pretty fair abilities ; when he was left to himself, I think he could make a pretty fair kind of a will ; I thought he might be easily influenced ; he did not seem to have much mind of his own lately, I thought ; James Weir did his business." " I did not observe any change in him, much, myself, lately ; but I had not much intercourse with him latterly. The last time I saw him, was less than two or

three months before his death. He talked then very reasonably."

Mr. Peixotto, a witness for the contestants and a clerk in James Weir's store, states that the decedent was in the habit of calling there every fair day, when he was well, except in the summer season. He says : " *I should think decedent had a fair memory*, I should judge so from his conversation ; I would read the paper to him and often heard him tell of things that had happened—frequently he would spin yarns and relate incidents of previous life." He " appeared to understand me as I read the newspaper to him ; he paid attention ; I took pleasure in reading to him ; he seemed always pleased, I judged so from his conversation ; he conversed upon the subjects I read about, as if he understood them ; the state of his mind, as to soundness, was fair." " I should judge he had capacity enough to understand a contract at the time it was made ; I would not say he would remember it five years after ; but at the time it was made I should judge he had sufficient mind to understand everything that was said about it." " I do not think his memory was so impaired that he would forget in a day or two ; he might in a longer time ; if it was anything *important*, I think he *could* recollect it a good while. I do not think he ever requested any transaction to be restated ; I would sometimes read part of an article to him one day, and part the next ; I would say, ' You remember what I said yesterday ?' and he would answer ' Yes,' and then I would go on."

Dr. Ogden, a witness for the proponent and an old acquaintance of the decedent, states that he saw and conversed with him at James Weir's house two years since, on the occasion of Weir's sickness. He says, " He appeared to have his faculties, so far as I saw ; there was no indication of any derangement or imbecility—not more than in persons generally of his age." The doctor mentioned some peculiarities, and adds, " When I saw him at Wier's, I did not observe in what he said, any indication of im-

paired or debilitated mind, but I thought the peculiarities I have spoken of had grown upon him by the effect of age."

Margaret Gambel, a blind woman, acquainted with the decedent for a long time, and visited by him in late years once or twice a week, states that his memory was excellent, and illustrates her opinion by the fact that he was in the habit of repeating to her passages and entire chapters in the New Testament. She speaks in unqualified terms of the soundness of his mind.

Mr. Haviland, who had known him from boyhood, and met and conversed with him frequently in the last four or five years, thinks his mind was as good as that of people at his age, generally.

Mr. Harding, whose step-mother was the wife of the decedent, and who had abundant and excellent opportunities of forming a correct judgment as to his capacity, says, *" I thought his mind was very sound and very acute. I don't think I ever perceived any failure in his mind, or any weakness or loss of memory."*

Mr. Martin, who had known him for more than thirty years, and frequently saw and talked with him, says, *" I always took his mind to be firm and strong.* It was the same as any other man's could be. He was in his right mind. That was so while I did the last work for him (in 1850.) I never found any difference. I thought he was very good as to intelligence. He was a man of sound intellect on every subject he conversed about."

Mr. Betts, who worked for the decedent, states that he gave directions in regard to the work, was inquisitive and attentive, and he saw nothing to excite any question as to his capacity.

Mr. Wheeler knew the decedent intimately for fifty years. He says, " He was a very retiring, excellent man. I had frequent conversations with him, and always found him rational—in his senses. The chief subject of our conversation was religion." *" He was as rational a man as*

*any man in this room: that I am positive of.* I never observed any weakness of mind, or that his intellect was giving way in the least."

The force of all this evidence in favor of the capacity of the decedent is, I think, increased, when we reflect upon his physical condition, and his peculiarities of deportment. The loss of distinct vision, very naturally tends to withdraw, as it were, the mind within itself. The necessity of depending entirely upon the memory would, it is true, lead to the preservation of that faculty, but likewise to greater care in precisely understanding what was said to him, an anxiety which might very readily, in connection with some slight defect in his hearing, induce a request to have matters he was desirous of comprehending, repeated to him. The chief avenue to his mind was through a single sense. Dr. Ogden describes him as a man who " pondered before he spoke"— rather " still and quiet;" and the general tenor of the evidence indicates that, although intelligent enough in conversation, he was not suggestive in starting topics. I see nothing remarkable in that. It would have been singular if the reverse had been the case. In regard to his hearing, the weight of evidence shows it was very slightly affected, and required, from a person speaking near him, only a clear and distinct voice, perhaps a little above the usual tone. The very witness who gave the most adverse opinion on this point, stating that he " considered him a very deaf man," said also, " He could hear pretty well if you talked to him in the tone of voice I am using on this examination. That is the tone in which I usually conversed with him. I think it is above the ordinary tone."

He certainly was not totally blind. His vision had become impaired in early life, when engaged in watchmaking, and grew worse with his declining years. But he was in the daily habit of walking the streets—he attended church and visited his friends—all without a guide. The accidents that happened to him, one of which occasioned his death, prove that he could not do this with impunity ;

and yet his general habit establishes a considerable degree of visual faculty. There can be no doubt that he could perceive forms, but probably not to such an extent as to recognize persons without the aid of the voice. It is the most ordinary thing in the world, for persons whose sight is defective, to have the power of perceiving a form without the faculty of distinguishing persons. It happens constantly, beyond a certain range of vision, with near-sighted persons. Although, as stated by one of the witnesses, the decedent could not *distinguish* one written instrument from another two feet off, yet he may very well have been able to *perceive* a written instrument at that distance. Mc Cord says, "I don't think he could possibly see to distinguish one letter from another—that is, ordinary writing or printing. He might very large letters, perhaps." Mr. Peixotto says, "I should not think the decedent could distinguish countenances at arm's-length, any time in 1848." "I do not think he could have seen his own signature, if he had signed it." Mrs. Gross says she does not think that, "for the last ten years, he could distinguish a person at arm's-length." Mr. Martin says, "He could see, I think, his own hand, when he held it up. He could discern a brick, and the joint of bricks, in looking at it with a glass which he carried—a pocket-glass. He could see forms by getting close. He could see gutter-stones, so as to step over and upon the curb." Mr. Harding says, "Two years ago, I think, he could distinguish a form before him." Margaret Gambel states that, standing by the window of her front room, he observed some flowers by the back-room window.

I am satisfied the decedent was perfectly competent to make a will; but in view of his condition and infirmities, the transaction should be carefully examined for any trace of imposition or artifice. Mr. Weir was his agent, and stood in a confidential relation. The will was prepared through the intervention of counsel with whom he was acquainted, and called in by him. This was the natural

channel in which the business would be done; but we must look to see if advantage was taken of this circumstance. It seems that the largest portion of the property is given to Weir; still there is no indication of this being inconsistent with the state of the decedent's affections. Weir, it appears, had been brought up by his uncle, and for several years had been entrusted with the management of his business. Brinckley was in the habit of daily visiting his store, unless prevented by ill health or bad weather, and was interested in him. I cannot say, under all the circumstances, that the provisions of the will are unreasonably partial. The decedent gives to his sister-in-law, Mary Brinckley, an annuity of $180, and to his niece, Mary C. Stevens, an annuity of $120,—which he charges upon one of the houses and lots devised to James Weir. He then gives, in legacies, over sixteen thousand dollars, as follows: To the Missionary Society of the Methodist Episcopal Church, $1,000; Robert W. Weir, $2,000; John B. Weir, $2,000; William H. Weir, $1,000; James Weir, $2,000; Charlotte A. Weir, $3,000; Mary Ann, the wife of James Weir, $1,000; William Weir, $1,000; Caroline M. Sneeden, $1,000; Adeline O. Sammis, $1,000; Delia A. Fitzgerald, $1,000; and to seven of the children of his deceased niece, Eliza Acker, $100 each. The residue is given to James Weir, with instructions, after an allowance to him of $350 per annum, as acting executor, to invest it, and apply such part of the income, as the executors should, in their discretion consider necessary, to the relief of the persons named in the will, as they might require assistance by reason of being in necessitous circumstances. Thus, none of the decedent's kin appear to be forgotten, and the legacies are substantial. There is a large number interested in the provisions, besides James Weir; and the only parties contesting are Mrs. Sneeden and Mrs. Fitzgerald.

But it is proper to consider the manner in which the will was prepared. Mr. Hopper, who drew it, states that it was drawn, in a measure, from a former will, which he

had drawn, and which was handed to him by the decedent. He says, "The alterations between this will and that will were made at his suggestion. I drew this will pursuant to his instructions." "I made some pencil memoranda on the old will, in respect to the alterations the decedent wished to make." "As the decedent dictated the alterations he wished, I made a minute of them." "He told me what alterations he had made; and in regard to one bequest, he gave me the reasons for it. That was the bequest to James Weir. He said that James had been very kind and attentive to him, for a long time; that he had the charge of his business for a considerable time, and he felt very grateful to him, and that was his reason for making a difference in his favor." The witness met Mr. Brinckley at Weir's store, and received his instructions there. After it was drawn, he delivered it to him, together with the old will, at the same place. This was the day before the execution. At that time he read the will to him. He says, "I read it to him two or three times. I recollect, I read it so often, and he was so particular in his inquiries—it got so late—I told him I could not wait to have it executed that afternoon, and would leave it with him. No one was present at this conversation; I am very sure no one was present. Whenever I went there about the will, we were always alone; I am confident when conversing about the will, we were alone. I read the whole will to him, in a very slow and distinct manner, going over the passages in a way that he heard me—that is, he appeared to. I read the old will, and then paused where the alterations were made, and showed him the alterations. I did not read the whole of the old will, but only such passages as he wished to have altered. I read the second will over to him the day it was executed, once or twice. I went over some parts of it again. I had as much trouble as I had the day before, in reading it to him, he was so particular. He said he had great difficulty in reading, and he wanted to remember it. There were no particular

explanations the second day. I read it very distinctly indeed. It was in a voice loud enough for him to hear. I recollect it was louder than my usual tone. I found I had to do so. He would insist upon my reading very slowly and distinctly. From his requesting me to read slower, and read over again, I got the impression he did not hear very well, though I did not know he was deaf. He would say to me, ' a little louder,' and ' a little slower.' I do not remember what was the precise tone of my voice, whether the same as I now use or not." It thus appears there was abundant care and deliberation in the preparation of the will, the ascertainment of the intentions of the decedent, and the explanation and reading of the document when drawn. When the decedent gave the instructions, Mr. Hopper spent an " hour or two " with him ; when the will was read the day previous to the execution, some considerable time must have been consumed ; and on the day of the execution, over half an hour was occupied in the same way. Nor is there any proof of any interference on the part of Mr. Weir in regard to the provisions of the will. He knew of its execution, and, probably, of the proposed alterations from the former will ; but there is nothing in the case from which to infer any direct management or influence exerted to bring about these changes. Kind offices and faithful services, in ordinary course tend to influence the mind in favor of the party thus acting ; and care should be taken not to confound the natural action of the human feelings in this respect, with positive dictation and control exercised over the mind of the testator. There is no trace of any such fraud, dictation, or control in this case ; and I cannot infer the existence of artifice or undue influence, merely from the favorable bequests to James Weir, especially in view of the emanation of instructions from the deceased, and the proof that the will accorded with his wishes and intentions.

It is contended, however, that the will was not executed in conformity with the directions of the statute. By the

Roman law, no person could make a valid will who lacked some of the principal senses—such, for example, as were deaf and dumb, or blind. Blackstone lays this down of those born deaf, dumb, and blind, who, he says, " as they have always wanted the common inlets of understanding, are incapable of having *animum testandi*, and their testaments are therefore void." (2 *Com.*, 497.) The rule was, of necessity, qualified by the reason of it, which was a presumed want of capacity. Persons born deaf and dumb could not make wills, on the supposition of insufficient capacity : *Surdus, mutus, testamentum facere non possunt.* (*Dig.*, *L.* XXVIII, *Tit.* 1, §§ 6, 7) ; but subsequently it was allowed where the defects were not congenital, and there existed sufficient testamentary capacity. (*Cod.*, *Lib.* VI., *Tit.* 22, § 10.) A blind man might make a nuncupative will, by declaring the same before seven witnesses ; but he could not make a testament in writing, unless it was read to him and acknowledged by him to be his will before the witnesses. (*Cod.*, *Lib.* VI., *Tit.* 22, § 8 ; *Inst.*, *Lib.* II, *Tit.* XII., § 3, 4 ; *Dig.*, *Lib.*, XXXVII., *Tit.* 3.) This was first permitted by a decree of Justin, and continued to be the rule of the civil law. *Cœcus, autem, non potest facere testamentum, nisi per observationem, quam lex divi Justini, patris nostri, introduxit.* It has not, however, prevailed in England, nor been incorporated in any of the statutes relative to wills. The object of requiring the will to be read to the blind man was doubtless to prevent fraud, the substitution of one instrument for another, and to secure evidence, beyond the mere *factum* of the will, of the knowledge of the contents of the identical will by the testator. It has not been made a formal ceremonial by our statute, in any case, that the will should be read to the testator in the presence of the witnesses, though it is eminently proper so to do where the testator is blind or cannot read. The statute is satisfied by the subscription of the testator, at the end of the will, in the presence of two witnesses, or the acknowledgment of such subscription ; the testamentary declaration of the testator ;

and the signature by the witnesses, of their names at the end of the will, at the request of the testator. These forms are necessary, but, even when satisfied by the evidence, do not always entitle the will to be admitted to proof. Something more is necessary to establish the validity of the will, in cases where, from the infirmities of the testator, his impaired capacity, or the circumstances attending the transaction, the usual inference cannot be drawn from the mere formal execution. Additional evidence is therefore required that the testator's mind accompanied the will, that he knew what he was executing, and was cognizant of the provisions of the will. I think that is all that ought to be required in the proof of the will of a blind person. But it is not essential it should be established by the subscribing witnesses. It may be supplied *aliunde.* As subscribing witnesses, all that it is necessary they should prove, is that ceremony which they witnessed, and which the statute requires. This satisfies the statute; and the additional evidence to which I have referred as proper in certain cases, may be afforded by other persons. The point presented is not entirely new. In *Moore* vs. *Paine,* 2 *Cas. temp. Lee,* 595, the deceased was blind, and only one of the three subscribing witnesses proved the instructions, the reading of the will to the testatrix, and her approbation of it. The will was sustained, on the ground that only one witness was necessary. In *Longchamp* vs. *Fish,* 5 *Bos. & Pull,* 415, before the Common Pleas, the precise question came up. That was a will of lands, which by statute was required to be executed in the presence of, and subscribed by, three witnesses. The will was not read over in the presence of the three attesting witnesses. The testator was blind, had dictated the will to one Davis, who read it over to him, took it away, got it copied, brought it back, fairly copied; two months after, the testator made an alteration in it; and then it was executed. It was contended that the will ought to have been read in the presence of the testator by one, at least, of the attesting witnesses. The court, how-

ever, ruled in favor of the will, Chambre, J. remarking as follows: "This question must be decided by the provisions of the statute of frauds. Now, it does not appear that the legislature, when they passed that statute, had in their contemplation execution of wills by blind men." "There cannot be a doubt, if this were an instrument by deed or any other written engagement, that the mere signature of the party, though blind, would be deemed a sufficient execution, and the only thing to be proved would be, that the blind man was not imposed upon. In this case, that fact is completely established, by an unimpeached witness, who took instructions from the mouth of the blind man himself, and wrote them down." The same point has been decided in regard to the will of a blind person, made under the provisions of the statute 1 *Vict.*, *c.* 26, which so nearly conform to those of our own law. In *Fincham* vs. *Edwards*, 3 *Curteis*, 63, the testatrix was blind. The will propounded was prepared by a solicitor from a previous will, the alterations having been made in pencil, and the instructions not being produced. The solicitor read over the former will to the testatrix, took her instructions, and drafted the will; but when the will was executed it was not read over to the testatrix in the presence of either of the subscribing witnesses. Sir Herbert Jenner Fust admitted the will to proof, saying, "Certainly, when the court is asked to grant probate of a will of a party totally or almost blind, it must be shewn to the satisfaction of the court, that the contents of the will are conformable to the instructions and intentions of the deceased. Undoubtedly, in this case, the will is not proved to have been read over to the deceased. A reference has been made to Mr. Williams' Treatise; but the case of *Barton* vs. *Robins* (3 *Phill.*, 455, *note*), shews that it is not necessary that the actual will should be read over, if there is proof that the party deceased knew the contents of it.". This decision was affirmed, on appeal, by the Judicial Committee of the Privy Council.

The only remaining objection to the probate, is defective execution, on the ground that one of the witnesses, Mr. Albro, does not prove the requisite ceremonials. The answer to this is, that it is not essential they should be proved by both witnesses. The question is, were they performed? Mr. Hopper proves, in a very clear and distinct manner, that they were. If he were directly contradicted by the other witness, the question would be different. But I do not understand Mr. Albro as explicitly denying any material statement of Mr. Hopper. The latter was attending to a professional duty, and would naturally give his attention to such features of the transaction as he knew to be essential. The former was a stranger, called in suddenly, and remaining just long enough to witness the execution. When he went in, he says, he thinks Mr. Hopper said, " ' *Mr. Brinckley is about making his will.*' My impression had been, from his manner of walking, that he was rather deaf, and his eye-sight was bad. I noticed that the decedent did not appear at that time to hear very well, for as I walked in, he did not appear to notice me, or look up ; but after his attention was called, or something was said, *he looked up.* The will was before him on the table. He sat close to it ; he sat up straight, with his hands crossed. I can't say I saw the decedent sign it. *I saw him in such a position that I supposed he signed it.* He sat close to the table, the will was before him. I don't recollect whether he had or had not a pen. I don't think I could recollect. I think he had an elbow on the table after a while. I don't recollect that anything was read while I was in there. I stayed but a few minutes. I could not recollect whether the attestation clause was read while I was there. I think Mr. Hopper drew the will towards him, signed his name, and then handed it to me, and I signed my name ; and then he said to the decedent, ' Do you acknowledge this to be your last will and testament ?' He rose up and looked towards him. The decedent gave a kind of look up, and assented by nodding his head. I

don't recollect whether his lips moved or not. I saw him nod his head. The question put to the decedent was said perfect and distinct, so that if a person was not very deaf he would hear him. I don't recollect that he asked him any other question; *but I went in such a hurry, and was so thoughtless,* that I don't recollect that he said anything, or that I heard him speak; if he did, it must have been pretty low. As quick as I heard Mr. Hopper ask the decedent if he acknowledged it to be his will, and he assented, I went right out, and left them there in the back room. *I think the subscription of the name of the decedent was at the end of the will when I signed.* I just looked over the will, to see it was a will, and what it was I was signing, and then signed my name." Again, " I think something was said by Mr. Hopper about its being necessary to have witnesses, or something like that." " He said, ' Mr. Albro will witness it,' or something like that. In a minute or two he looked up, after that, and I was thinking whether or no he heard. He was sitting upright. I did not see him sign it. My impression was he signed it, but I might be mistaken. If he had not, I should have thought it something singular, and should have charged my mind with it." " I was not asked by Mr. Brinckley to witness the will, but I think something was said whether I should not witness it; but I won't be sure."

On the other hand, Mr. Hopper distinctly states that he told the decedent " it was necessary to have two witnesses." He consulted Mr. Weir as to whom he should send for, and then sent for Mr. Albro. " When Mr. Albro came into the store where Mr. Brinckley was, I told him Mr. Brinckley was about to execute his will, the law required two witnesses to the will, that I would act as one of the witnesses, and he was wanted to act as the other. Mr. Brinckley was present, and perfectly understood me—that is, he appeared to." The witness then proves the signature of the will by the testator, in the presence of both witnesses, his testamentary declaration, the request to the

witnesses, and their signature. Again he says, "I said to the decedent—Mr. Albro, a neighbor, is here, and ready to witness the will. The decedent said he was ready, asked for a pen ; I handed it to him ; he wrote his name." Again, "He signed it, handed it to me, and I asked him if we should proceed to witness it; he said, Yes. I said, Mr. Brinckley, do you declare this to be your last will and testament you have just signed ? He answered, I do. I said, Do you desire Mr. Albro, the gentleman now present, and myself, to witness your signing and declaration ? He said, I do. After Mr. Albro came in, and after the decedent had signed the will, I told him there was a little ceremony to go through, and that I would read to him the attestation clause. I read to him the attestation clause, and told him that now Mr. Albro and myself would sign our names, if he desired it. He said he did, he wanted us to do so ; and we thereupon did sign it."

This proof, I think, is clearly sufficient, and is not overcome by the want of recollection on the part of the other witness. In England, in regard to a will executed under the provisions of the statute 1 *Victoria*, *c.* 26, it has been decided that positive affirmative evidence by the subscribing witnesses, of the fact of signing or acknowledging the signature of a testator, in their presence, is not absolutely essential to the validity of a will ; and that the court may presume due execution by a testator, upon the circumstances. (*Blake* vs. *Knight*, 3 *Curteis*, 547.) This is accordant with the current of decisions under our own statute, and the rule is marked by good sense and conformity to the established principles of evidence. Thus, in *Remsen* vs. *Brinkerhoff*, 26 *Wend.*, 332, it was admitted that where the facts essential to the valid execution of the will are stated in the attestation clause, the mere want of recollection of the witness is insufficient to overthrow the presumption of due execution. In other cases it has been repeatedly decided that where *one* of the subscribing witnesses swears that all the formalities required by the statute

were complied with, the will may be admitted to probate, notwithstanding the other attesting witness may not be able to recollect the fact; and that the attestation clause, after the lapse of time, and on a want of recollection by the witnesses, affords a presumption or inference that its recitals are true. (*Chaffee* vs. *The Baptist Miss. Con.*, 10 *Paige,* 85; *Jauncey* vs. *Thorne,* 2 *Bar. Ch. R.*, 40; *Nelson* vs. *Mc Giffert,* 3 *Bar. Ch. R.*, 158; *See* 19 *J. R.*, 386; 4 *Cowen,* 483; 1 *Wend.*, 406; 11 *Wend.*, 599.) I am satisfied, therefore, that the execution of the will is duly proved in all formal respects; and it having been satisfactorily shown that the will was prepared under instructions given by the testator personally, I see no reason, in the absence of any evidence affirmatively establishing fraud, influence, restraint, or imposition, why it should not be admitted to probate.